## FRANKLIN V. MEYER.

1. **RECEIVERS:** *Circuit judges may appoint in vacation.*
   The act of January 15, 1857, conferring upon circuit judges the power to appoint receivers in vacation, has not been repealed by any provision of the Code, and the power may still be exercised.

2. **CHANCERY PRACTICE:** *Taking account.*
   It is the better practice in all cases where an account is to be taken, to have a hearing for the determination of the general rights of the parties, before making a reference to a Master, and to direct the Master specially as to the matters referred.

Franklin v. Meyer.

3. LANDLORD'S LIEN: *Not displaced by taking a mortgage upon the crop for his rent.*

A landlord's lien upon the crop for rent, is not displaced by his taking a mortgage upon the crop for it. The latter is cumulative to the former, and he may enforce either; and so, where a landlord holds an unrecorded mortgage on the crop for rent, a first mortgagee of the crop may pay off the landlord's statutory lien out of the proceeds of the crop coming to his hands, and the amount will be allowed him in an account taken between him and other incumbrancers upon the crop, before any credit upon his mortgage.

4. EQUITABLE LIENS: *Advances to make crop.*

Ordinarily, one who has a duty to perform, or interest to protect, with regard to property under his control, will be reimbursed in equity for such outlays as the performance of the duty or the protection of his interest may require; but this is a creation of equity, to be applied when the outlays are strictly necessary. There is neither by common law nor by statute, any lien to a merchant for supplies and advances to make a crop, although reasonable for the purpose; and if a first mortgagee upon a crop, for a specified amount of supplies, exceed in his advances the amount specified, he will be postponed as to the excess, to the claims of a subsequent mortgagee.

5. ESTOPPEL.

Estoppel applies only where one, by word, act or acquiescence, induces another to *do* something.

APPEAL from *Jefferson* Circuit Court in Chancery. Hon. J. A. WILLIAMS, Circuit Judge.

*W. S. McCain*, for appellants:
Argued upon the facts that the decree should have been against Meyer on the account.

*Bell & Elliott, N. T. White*, for appellees:
Argued on the facts *per contra*.

STATEMENT.

EAKIN, J. On the nineteenth of December, 1874, Israel

7—36

Stewart, by written articles of agreement, rented from Brodie, as guardian of the Siler heirs, the Siler plantation, in Jefferson county, for the year 1875. The rent agreed upon was $1,800, to be paid out of the first cotton ginned and picked, and which was to be delivered in marketable order on the banks of the Arkansas river, enough to pay one-half, by the first of November, and the balance before the first of December; Stewart agreeing, further, not to remove any cotton from the plantation, without Brodie's consent, until the rent should be paid. There were stipulations regarding the mode of ascertaining the value of the cotton, which it is not important to notice. It was further agreed, that if the rent was not paid by the first of December, Brodie might take possession of the plantation and crops, pick the cotton, prepare it for market, sell it for the best price at public auction, pay the expenses, and apply so much of the balance as might be necessary in discharge of the rent.

At the same time, by like articles of agreement, Stewart rented, for the same time, from Brodie, as the agent of said Brodie's wife, another plantation, for the sum of $900. Like stipulations were made, and powers given, for the payment and collection of rents out of the crop, upon which a lien was expressly given, with a promise that if the same should be deficient, the rents should be a lien upon the crops raised upon the Siler place also.

Both these articles were duly acknowledged, but neither was recorded.

Stewart took possession, and proceeded to cultivate both places. On the first of March, 1875, he conveyed to appellee, Adolph Meyer, as trustee for G. Meyer & Bro., a number of mules and horses upon the Siler and Stewart places, together with all the wagons, farming utensils, and stock of any kind, and all accounts against the hands for

supplies or stock, with his entire interest in the cotton and corn on "the above place," cultivated by him, and also his individual half interest in a crop of cotton on the *Nichol* place—all to be raised in 1875. The deed then recites that Stewart was indebted to G. Meyer & Bro., in the sum of $4,018.45, composed of a promissory note for $1,206.64 in favor of Wilkins & Bro., one note for $1,311.81 in favor of G. Meyer & Bro., and an open account of $1,500 due the last named firm for supplies "during the present year," all to be due and payable on the first day of November, 1875. The deed was to be void on payment, duly made, and on default, the trustee was empowered to take possession, sell, etc., with usual provisions for notice, and application of the proceeds, allowing the trustee 5 per cent. for commissions. This deed was duly acknowledged and recorded on the eleventh of the same month.

Afterward, on the first of November, of that year, Stewart made a second deed of trust to appellant, Samuel Franklin, trustee, for the benefit of the firm of Alcus, Sherick & Antry, of New Orleans. This deed contained all his interest in his crops upon the Siler place, the Brodie place, and the Nichol's place; also, some mules, horses and wagons on the Siler place, and a lot of cattle; also, a horse on the Nichol place; in short, as the parties concede, the property is the same as that included in the former trust. This deed recites an indebtedness to Alcus, Sherick & Antry of six thousand dollars, as shown by a promissory note of even date therewith, due December 1, 1875, with interest at 10 per cent., upon payment of which the deed was to be void. Otherwise, provision was made for sale by the trustee, and for appropriation of the proceeds. It was duly acknowledged and recorded on the same day.

In March, 1876, Franklin, as trustee, together with Alcus, Sherick & Antry, filed this bill against the grantor,

trustee and beneficiaries of the first deed, stating that the last-mentioned trustee, or his beneficiaries, G.. Meyer & Bro., had taken possession of twenty-four bales of cotton, included in both trust deeds, and were claiming to hold and dispose of the same under their deed, but in fact their secured debt had been paid, and they had no other lien upon it. Complainants say that Stewart still owes them on the debt secured by their deed of $4,303.11, which is a lien upon those bales. They charge that G. Meyer & Bro. had previously received, of the mortgaged property, one hundred and sixty-six bales of cotton, worth from $40 to $50 per bale, which over-paid their secured debt by at least $1,500, but had applied the proceeds of the same to other debts; also, that there still remain upon the places mentioned in the trust deeds, about twenty bales of cotton of the property conveyed. They fear that may be removed from the state, as well as the twenty-four bales above mentioned, and that the balance of the personal property will not pay their debt. They charge that G. Meyer & Bro. have already taken possession also of the mules and all other personal property. They say that G. Meyer & Bro. were advised, at the time, of the execution of the second deed, and that Stewart had expressly directed them to apply the proceeds of the cotton, turned over to them, to the payment of their trust debt, and complainants claim their lien upon the said personal property. They pray for a foreclosure as to the same, and that G. Meyer & Bro. be held to account to them for all proceeds of the mortgaged property, received by them beyond their secured debt, and for a receiver to take charge of the personal property remaining. Upon presentation of the bill to the circuit judge, in vacation, a receiver was appointed, who accepted and gave bond. Afterwards, on the meeting of the court, defendants moved to set aside the order in vacation, because

such action was not within the power of the circuit judge in vacation, as well as because the bill showed upon its face that the remedy was at law, and because there were no allegations of fraud and waste.

On the twenty-sixth of May, 1876, a Master was appointed in the case, with no instructions, and for no expressed purpose disclosed by the order. No action was taken on the motion to vacate the order appointing a receiver.

In June, 1878, as appears from the transcript, Meyer and Wilkins answered, expressly admitting that their trust deed was made to secure the sum of $4,018.45, and that when the complaint was filed there was in "his" hands twenty-four bales of cotton; but says that thirteen bales of it was not in the trusts, but was "his" own property, being taken for debt from one Britt Taylor, the producer. The possession, singular in these expressions, seems to refer to G. Meyer.

He admits, also, the possession of five mules and two wagons, of the mortgaged property, and says he took them by permission, and order of Stewart, based upon his claim under his trust deed, and that he was about to sell them and so apply the proceeds.

They deny that Stewart delivered to them 166 bales of cotton, saying that he only delivered five. They admit that he made shipments at various times to their account with Alcus, Sherick & Antry, of a number of bales of cotton upon which they drew, but do not know whether it was properly embraced in the trusts or not.

They deny that their secured debt was paid, and claim that there is still due upon it $2,709.41.

Meyer and Wilkins then make their answer a cross-bill against their co-defendant, Stewart, and charge that from the first of March to the time of the execution of the

second trust deed, they advanced him money and supplies absolutely necessary to him in making his crop, in excess of the amount secured by their own deed, to the extent of $3,672.64, which complainants, Alcus, Sherick & Antry, as well as their trustee, Franklin, well knew when they took their deed, and that complainants then recognized this debt as prior.

They set forth the tenancy of Stewart, as lessee, and say that all the cotton received by them was made on the Siler and Brodie places, for which there was rent due on the first of October, 1875, to the amount of $2,500, which was a lien paramount to all. This claim Brodie assigned to G. Meyer for collection, and the money received on cotton was, they say, first applied to said rent. Claiming that their debt, secured by the trust, is still unpaid, they pray for a foreclosure and sale of the property.

Stewart, answering the cross-bill, denies the statement of the original bill, to the effect that he had turned over to the benefit of the first trust 166 bales of cotton; but says that he turned over five, and afterwards shipped the cotton covered by the trust deeds, to Alcus, Sherick & Antry, as fast as he could get it ready for market, to the amount of about 200 bales; that, on the bills of lading, he drew through the Pine Bluff banks $6,800, and turned the drafts over to G. Meyer upon the first deed of trust. They are set forth by date and amount. These, he says, with the five bales of cotton, amounting to $129.11, more than paid the first trust deed; and says, further, that at the time of giving the said drafts, and the payment of the sum to G. Meyer & Co., he directed them to be so applied.

He says, further, that he shipped to Alcus, Sherick & Antry fifty-seven bales of cotton, the proceeds of which, amounting to $2,722.72, was paid to G. Meyer & Bro., on said deed of trust, according to his express instructions to

that effect, and, further, that he let G. Meyer & Bro. have, on the same account, 166 sacks of cotton seed, worth $58, and also paid on same account $34.95, balance on a sale of horses, and that all these payments together on said deed of trust amounted to $9,744.79, made before the original bill was filed. As to the rent note, he admits its execution, and its transfer to Meyer, and submits to the court whether or not it was a lien upon the crops.

He denies that thirteen of the twenty-four bales of cotton mentioned in the original bill, were not his property when it was filed, but says that they had been sold to him by Britt Taylor for rents and supplies furnished. He denies the correctness of the statement of the account of G. Meyer & Bro. against him, filed with their cross-bill, and asks that they file the same, itemized.

He denies, further, that, at the time of executing the second deed of trust, there was any understanding between himself and Franklin, or the beneficiaries, that he owed Meyer & Bro. in excess of the sum secured by the first deed, the sum of $3,622.64, to be paid out of the crops; but, on the contrary, avers that it was at that time the express understanding with Franklin, acting for Alcus, Sherick & Antry, that the only debt owing by him to Meyer & Bro. and Wilkins, was that stated in their trust deed.

It seems that a Master was then appointed. The order appointing him makes no reference to the parties, nor does it contain any directions. It appears, however, that the Master returned a report on the first of June, 1877, reciting instructions given by the court on the twenty-sixth of May, 1877, to examine and report:

1. How much of the cotton raised was applied to Brodie's rent, or any other lien superior to the deeds of trust

2. How much of the proceeds of that raised on the places, and shipped to Alcus, Sherick & Antry, was received by Meyer & Wilkins under their deed of trust.

3. How much of the proceeds of the property in the deed of trust was received by them from all sources; and

4. How much of the proceeds were received by Alcus, Sherick and Antry, under their deed of trust?

In response to the first he reported that Meyer & Bro. by their acceptance had paid $2,500 on the rents, on the twenty-fifth of October, 1875. In this connection he further reports that he had ascertained that there had been obtained from Alcus, Sherick and Antry, to preserve and prepare the crop for market $2,481.50, making with the rent $4,981.50, which amount was a lien superior to both deeds of trust.

The result of his reply to second and third points is, that Meyer & Wilkins had received out of shipments of 144 bales of cotton by Stewart, the sum of $6,929.11 under their deed of trust, and from other property in the deed, horses and cotton seed, $238.91, besides four more bales of cotton which had been put to Stewart's credit, amounting to $175. In all $7,342.02

Upon the fourth point, he reported in effect that Stewart was due Alcus, Sherick and Antry, on their deed of trust on the first day of December, 1875, the sum of 4,103.32, amounting, with interest at 10 per cent., to $4,718.81, on the first day of June, 1877.

Defendants excepted to this report, because it allowed the advances made by Alcus, Sherick and Antry to preserve the crop, to be a paramount lien, and had not given the same advantage to those made for like purpose by defendants. Also, because the report showed that there had been shipped to account of Meyer & Wilkins 154 bales of cotton, when the evidence showed that with the exception of fifty-

seven bales, which went to pay rent, almost the whole crop was shipped in the name of Stewart, upon which his drafts were drawn. Also, because they were charged with the receipt of $2,500, which went to pay rent, and should not be applied on the mortgage account. Also, because they were charged with $150, for two horses, when the evidence shows that they were received in exchange for corn, which was used in making the crop, and not charged in their accounts. Also, because the cotton seed with which they were charged, had been taken by virtue of a writ of replevin, and the suit was still pending. Also, because four bales of the cotton was not a part of the mortgaged property, and was received by defendants before the execution of the deed of trust to Franklin. Also, in effect, because the report charges them with having received on their mortgage $7,342, when, in fact, they should have, at least by the report itself, credits for the matters in the above exceptions, to the extent of $2,963. Also, because the report gives to complainants credit for $2,509.82 on a draft paid to Nichol, without showing that Nichol had any superior lien, whereas they should be charged in favor of defendants, with the proceeds of the cotton out of which the draft was paid.

The complainants on their part excepted, because the rent paid by Meyer & Bro. was allowed as a superior lien.

A mass of depositions taken in the case, and which seem to have been used by the Master, appears in the transcript.

Upon final hearing the Chancellor found that on the first day of November, 1875, there was due Meyer & Bro. and Wilkins & Bro. the sum of $6,000, composed of the amount mentioned in their deed of trust, and advances made on the crop; that when the second deed of trust was executed, Franklin, the trustee therein, agreed that said debt should be a prior lien upon the property, and that he would pay

the same, and that there was still due said firms upon the property taken by the receiver the sum of $2,678.52, less a deduction of $391.66 on account of 10 per cent. interest charged for advances and for interest charged after November 1, 1875, and for costs of legal proceedings after that date; and to be augmented by the sum of $48.70, being amount of interest included in the credits after said date; the said debt to be subject to the further deduction from account of Wilkins & Bro. of $139.38 for charges, including house rent made after November 1, 1875, and interest in excess of 6 per cent. up to November 1, 1875, leaving balance on first trust deed of $2,196.18 at that date; the same to bear 6 per cent. interest per annum.

The decree states that the thirteen bales of cotton named in the answer were turned over to the defendant Gabe Meyer, by order of the court as property not embraced in the deed of trust. The debt so above found was declared a prior lien on the property in the hands of the receiver, who was ordered so to apply the proceeds, after payment of defendant's costs by turning over a sufficient amount to Adolph Meyer, the trustee in the first deed; and the balance, if any, to Franklin, the second trustee.

The Chancellor further found that there was then due from Stewart to Franklin, as trustees for Alcus, Sherick & Antry, 4,650.33, which was a second lien, and which Stewart was ordered to pay, and upon which any surplus to be paid by the first trustee to Franklin should be applied; and that Stewart should pay costs. From this decree both complainant and Stewart appealed.

### OPINION.

**1. RECEIVERS: Chancellor may appoint in vacation.** The question is presented of the power of the Chancellor to appoint a receiver in vacation. Any error in this would, of course, be cured by the recognition of the

receiver, by the court in session, and it is not urged, in argument, as a practical question in this case. Nevertheless, it is one which should be settled, for order and uniformity of practice, in equity proceedings, and that Chancellors may know when such relief is invoked, whether they may exercise their discretion without an unsurption of authority requiring cure.

By the English practice, the Chancellor, in the exercise of his extraordinary jurisdiction, as distinct from his common law powers, is, himself, at all times, a court. The modern practice of having terms for business, is for convenience. His action and orders were those of the court, and hence, a receiver is always spoken of in the books as an officer of the court, and the order appointing him as an order of court. No inconvenience nor defect of justice could arise from his want of power at any time, and the English books afford little light upon the question now presented.

We, at a very early period, gave to the circuit court a general chancery jurisdiction, when a remedy could not be had in the ordinary course of common law proceedings, and provided that those courts should be considered as always open for granting writs of *ne exeat* and injunction. This was by the laws of the Louisiana territory, in 1810, since which time it has always been considered that the words of the act, *proprio vigore*, invested the circuit courts with all the jurisdiction of the extraordinary court of chancery in England, and adopted the practice and proceedings of that court, so far as the same could be exercised by the circuit courts, as such, under our judicial system. But powers conferred upon courts do not attach individually to the judge in vacation. Independently of special statutory powers, he is then a mere citizen, and without legislation to that effect, could not have appointed a receiver. Pressing and urgent occasions for them seem not

to have arisen frequently in the early history of our state. I do not find in our reports any exercise of the power by a judge in vacation, before the act of January 15, 1857, which expressly conferred it. The obvious necessity of it, with the increase of population, wealth, and diversified business operations, probably, prompted legislative action, and since then the practice has been common.

The act has never been expressly repealed. The new Code of Civil Practice, adopted in 1868, made no other provision for the appointment of receivers in vacation, than one under the head of attachments, which was ancillary to an action at law, and for the preservation of property attached. It does not reach the class of cases under discussion, and is not within the scope of the maxim, that the expression of one thing is the exclusion of another.

The compilers of Gantt's Digest, however, acting, doubtless, under the impression that the system of practice, introduced by the Code, was intended to cover the whole field, did not bring forward into the Digest the act of 1857.

We do not think the Code so Procrustean in its effects. A more rational, and indeed necessary view, is to consider it mandatory where express, and as furnishing substitutes for the former practice, exclusively to be followed, when its evident intention is not only to cover the whole matter of the particular remedial process, but to make it complete. The wit of man can not at once devise a system of practice, covering the whole field of remedial jurisprudence, and meeting every necessity without the supplemental aid of past usages. It must presuppose them.

The cases are numerous, where property can not be safely left in the control of either party, and when no grounds of attachment can be alleged. This is often the case in railroad and manufacturing corporations, and in partnerships, which involve great interests. If the power to ap-

Franklin v. Meyer.

point receivers in vacation has been overruled by the Code, save in the special instances mentioned, great and irremediable losses may occur. It would be pressing a mere maxim of construction too far, to suppose such to have been the intention of the legislature, and it follows that the practice in chancery of appointing receivers in vacation, having been adopted to render our system more closely analogous to that of England, and more complete in its remedies, has not been repealed by the language or spirit of the Code.

It is a power to be exercised by judges in vacation, with great circumspection, as it is harsh and dangerous, but one within their discretion.

Perhaps from defect in the record, the proceedings in this cause, with regard to the reference, seems very irregular. It does not affect the merits, which may be gathered from the whole record, but is deemed proper for comment in the exercise of that supervisory control over inferior courts, intrusted to this court by the constitution, not only to correct their substantial errors, but to present uniformity of practice. In this case there does not appear, of record, any decree whatever, before the order of reference. The cases where this would be proper are exceptions. The practice, if general, would often lead to unnecessary expense and delay.

The aid of a Master is invoked, usually, for the investigation of details of facts, and to make orderly statements and summaries. Before that is done, there should be a decree upon the rights of the parties upon principles of equity, as they may be affected by the facts to be found by the Master —and the hearing for that decree should be upon the pleadings, and such evidence as tends to determine the rights of the parties. If that is done in due order the Chancellor might find no reference to be necessary. If one be required,

it should be made for the satisfaction of the court, and for the ascertainment of such facts and details, as may be necessary to apply the principles determined to the exact settlement of the matters in litigation. As to the evidence, no precise rule can be well laid down, except that the Master may use any evidence used upon the hearing, and may always take additional evidence as to matters of detail, and facts affecting the application of the principles of the decree. In taking the depositions of witnesses for the first hearing (which is indeed the hearing of the cause, the subsequent hearing being only an exception), many such facts will be included; but they need not be, save for convenience, and to avoid the expense of a second examination. They might, however, save for some such reason of convenience, be deferred to be taken before the Master. "The ordinary investigation of facts carried on before the Master," says Mr. GRESLEY, p. 503, "is simply an arrangement for the sake of convenience. The judge who *hears the cause* has not time to pay his undivided attention to the minutiæ of every suit; and is, therefore, content to adopt the opinion of an officer delegated to look into the proofs. With a further view to convenience, and also the saving of expense, it becomes allowable, and customary to defer the proof of various matters until a *decree has been obtained;* for then the topics essential to the questions which the judge contemplates deciding, are *pointed out* with certainty and precision. Consequently, every sort of evidence which can be used at the hearing, may also be used before the Master."

Whilst it is not error, therefore, to direct an account before a decree, inasmuch as the answer itself may show the liability, yet it is the better practice in all cases to have a hearing for the determination of the general rights of the parties, and to direct the Master specially as to the matters

*Master may use any evidence used at the hearing.*

referred, leaving proof of details to be taken by him. In this case, for instance, it would have been more orderly to have decreed that the firm of G. Meyer & Bro. should account with the second trustee, and with Stewart, for sums received; and that complainants were entitled to foreclosure, and to have settled the order of precedence of all liens brought by the pleadings to the notice of the court, instead of leaving them to the determination of the Master. They are matters of law.

After these remarks for the guidance of the courts in matters of practice, we now proceed to the essential merits as disclosed by the whole record.

First, as to the rents to be paid Brodie: The leasing was by written contracts, signed by him and Stewart, giving an express lien on the crops for the rent, and more extensive powers over them than were conferred by statute. The instruments were, in effect, equitable mortgages upon the crop, with power to seize in case of default. They were acknowledged, but never recorded, and, according to our decisions, did not, even with notice, affect the rights of any of the beneficiaries in the several deeds of trust, both of which were. The question remains, whether they destroyed the statutory lien, which the landlord would have had without them.

<div style="float:right">3. LAND-LORD'S LIEN Not displaced by taking a mortgage on the crop for rent.</div>

The vendor's lien for purchase-money is the mere creation of courts of equity, which, in creating, have surrounded it with its own equitable qualifications. It is independent of common law or statute, the original growth of the Chancellor's conscience, in dealing with which they meet no restrictions. Hence, they have held that they can not co-exist with an express lien, or with other security, unless there be shown a manifest intention to retain it.

Legal rights, however, whether arising from contract or given by statute, stand upon their own foundations, inde-

Franklin v. Meyer.

pendent of equity, and with regard to them the rule is reversed. They will remain, unless expressly renounced, or there be some contract between the parties inconsistent with them. In this case, the powers conferred, and valid between the parties, under the leasing contracts, were cumulative. The landlord had the power, at his option, to enforce his statutory lien during its existence. The contracts could not have been set up as estoppels to appropriate proceedings under the statute. The payment was made by Meyer out of the proceeds of the crop while the statutory lien existed. It was the first lien, and its payment inured to the benefit of all concerned. It should be allowed in the account, before any credits on the first deed of trust.

*Landlord may enforce either statutory or mortgage lien.*

An important question arises with regard to advances made by the beneficiaries of the first deed, over the amount secured, in order to enable Stewart to make the crop. It is insisted by the appellee that this whole subject is settled by this court, in the case of *Bell, Trustee, v. Radcliffe, Trustee, in 32 Ark., 645*, and that in making advances for this purpose, they had the right to extend their own security, and detrude the second trustee from the crops until they should be satisfied in full.

The remarks of the learned judge who delivered the opinion in that case, are to be taken in reference to the question and the facts presented by the record. That was a case where the advance of supplies and money in sufficient quantity to make the crop, affirmatively appeared as the true consideration of the first trust deed, and to secure the advantage of such supplies appeared to be its leading purpose.

The court held, that, under the facts, the amount named should be subordinated to the leading purpose, and that the deed might stand for a larger amount. But that was not all. The excessive advances were made not only by

Franklin v. Meyer.

consent, but upon the urgent request of the beneficiary under a second mortgage of the crop, who agreed to guarantee the repayment of such excess. That case stands upon its own circumstances, and any other decision would have been shocking to a sense of candor and ingenuous, fair dealing. But it is not to be extended beyond the peculiar equities arising from the conduct of the parties.

Ordinarily, one who has a duty to perform or interest to protect, with regard to property under his control, will be allowed reimbursement, in equity, for such outlays, as the performance of the duty, or the protection of his interests, may require. This, too, is a mere creation of the chancery courts, and an equity to be applied, when the outlays are strictly *ex necessitate.* There is neither by common law, nor statute, any lien in favor of a merchant for supplies or advances to make a crop, although reasonable for the purpose. No one is legally or morally bound, or can have other than a speculative interest, in assisting another to make a crop. If he does so, it is fitting that he should rely upon his confidence, or cause such writings with regard thereto, to be executed and recorded as will fairly give notice to the world. The effect of the decision in *Bell v. Ratcliffe (supra)* is that, if such notice shows a general and leading purpose to retain a lien upon the crop for *all* supplies, although an inadequate sum be mentioned, and if the excess of supplies be furnished at the request of a subsequent mortgagee of the crop, the lien of the latter will be postponed. Both the conditions, in this case, fail. There is, in the first trust deed, no indication of a general purpose to retain a lien for all supplies, to any amount, nor of any request on the part of those claiming under the second deed that any should be advanced in excess of the amount secured. Franklin, it is true, was informed about the time he took the second deed, as trustee, that

8—36

Stewart owed the Meyers about $6,000, and the same information seems to have been given to Alcus; but the excess had then been already advanced, and such information did not estop Franklin from standing on his legal rights. The principle of estoppel can not apply. It has place only where one by word, act, or acquiescence, induces another to *do* something. The excess of credit, given to Stewart, could not prevent Franklin, or his beneficiaries, from taking the second deed, even with notice. The evidence is not clear to show any express promise by either of them, at the time of taking the second trust deed, to the effect that they would concede the application of the trust property to be made to all the *debt* due Meyer & Co., as distinct from the debt secured by the first deed.

*ESTOPPEL: What it is.*

It follows that all the proceeds of the trust property, and the value of that taken in kind, received by Meyer or Meyer and Wilkins, should, after payment of rent, be applied to the debts in the first trust, with interest on the two notes at ten per cent., as expressed on their face, and on the $1,500, of account, at six per cent., and that they should be held accountable for any excess of such property, to the second trustee; or, in case of deficiency, that their said secured debt should be paid in full out of the hands of the receiver, which would be, in effect, a foreclosure of the first trust deed.

Franklin, as trustee for Alcus, Sherick & Antry, is entitled to a foreclosure of the second trust deed for any amount within the limits therein expressed, and the court should apply to that purpose whatever may be remaining in the receiver's hands, and render a personal decree against Stewart for the balance, together with a personal decree against Meyer, or Meyer and Wilkins, as the case may be, for any excess they may have received over their

said secured debts, to be a credit on the decree against Stewart, when collected.

To that end, another reference seems necessary, that the Master may make his report and accounts more advisedly free from legal perplexities and upon the facts, with liberty to use the pleadings and evidence already in, and to take any other evidence necessary to ascertain the facts which would determine whether or not certain property come within the trust, by whom ·received, and its value, and with directions to state the accounts of the parties according to the principles herein announced, showing the amounts due under each trust, and·what amounts, if any, have been received in excess.

It seems expedient, for dispatch, to determine here some other points of law which may arise before the Master.

It appears that eleven or thirteen bales of cotton received by one Taylor, as a sub-tenant of Stewart, were taken by Meyer, under the authority of the deed of trust. By assent of Taylor and Stewart's agent, they were turned over to Meyer upon Taylor's own debt. Two of them stood in place of two bales which had been borrowed by Taylor out of Stewart's crop, and were thus recovered by the trust. The others were dependent upon the question whether they belonged to Stewart as rent. The trust deed only covered Stewart's rights in the produce, and not the profits of his tenants. If they were trken as rent, neither Stewart, Taylor nor Meyer had any right to appropriate them outside of the secured debt, and thus detrude the second mortgagee from his legal right to so much of the surplus as would remain if they had been rightfully appropriated. If not rent cotton, and not appropriated at the time to the first mortgage debt, the Master will take no account of them.

It seems that some cotton seed was taken by Meyer, by

virtue of a writ of replevin still pending.   Neither party in the pleadings, seeks any relief with regard to the outstanding suit, but defendants claim that they should not be held accountable for the seed, on account of their liability to a judgment at law for a return, or its value. This affords. no impediment to the account.   If the defendants, although resorting to law, got the seed by virtue of their rights under the trust, they should be charged with so much as was the product of the plantation named. The Chancellor may, if he deem it equitable, allow the' pleadings to be amended at any stage, and enjoin the defendant, in replevin, from prosecuting his right at law for a return of as much as may be charged against Meyer in this suit.   The necessity of this will depend on existing facts to be brought properly to the notice of the court by any party interested.

The defendants obtained from Stewart some horses by trading.   They were trust property, and Stewart had no right to sell.   Meyer will be charged with their value, less the value of any property he may have given in exchange, used upon the plantations, and appropriated to the purposes of the crop, if of a nature not to be consumed in using. If the property given in exchange be such as corn,. meat or supplies, such a trade would be equivalent to taking the property out of the trust for advances not covered by it, and not permissible.   The whole trust fund might be thus made to pass, piecemeal, for debts upon account, leaving the trust debt remaining.

In stating the account, interest at ten per cent., after maturity, should be allowed on so much of the debt of Meyer & Bro., and Wilkins & Bro., as was shown by the notes, upon their faces to so express.   So much of the debt ($1,500) as was for open account, should bear

interest at six per cent. until all be paid. All other interest, on both sides, should be calculated at six per cent.

It is probable that the principles herein announced, with their legitimate consequences, will meet all points which may arise on a second reference, and enable the court to conclude the case without much delay. It is best, however, that it should be done in the court of original jurisdiction.

The court erred in allowing the defendants the sum of $6,000, to be secured by their first deed of trust, and in some other minor respects indicated in this opinion.

Reverse the decree, and remand the cause for further proceedings, in accordance with law, and the practice in equity consistent with this opinion.